This action was brought by the plaintiff to recover damages for an alleged breach of a contract which was made between the plaintiff and the defendant in November, 1901. The contract is writing, and is embraced in a written correspondence between the plaintiff and the agents of the defendant. On 22 October, 1901, the plaintiff wrote to C. R. Capps, the general freight agent of the first division of the defendant's road, at Portsmouth, Va., and also on 31 October, 1901, to C. H. Hix, division superintendent, in the same words, as follows:
"DEAR SIR: — I am cutting and expect to cut fifty car loads of mining props, twenty-seven feet long, near Roxobel, N.C. There is absolutely no accommodation for loading the same at Roxobel siding, as it is all taken up with cord wood, Brown and Bundy's place, where they have to pile their lumber prior to shipping, and C. T. Harrell's ginhouse and site. Also, S. T. Hedgepeth tells me that he has fifty or sixty thousand feet, which he expects to begin to cut and load now soon at Roxobel, if he has not already started; and, further, were it possible for me to load at Roxobel, your company has not any place for me to drop the props on prior to loading; and Liverman, the party who owns the land adjoining the depot, will not allow anyone to drop props on his premises without paying him one cent per log for use of same, which charges I am not willing to pay. Consequently, under the many existing circumstances, I respectfully ask you to grant me train to load my props on the main line. I think that there is no doubt but what I could load a train in one day." *Page 257 
The letter to Hix was sent by him to Capps, and on 18 November, 1901, Capps wrote to the plaintiff, at Woodland, in Bertie County, N.C. along the line of the first division of the defendant company, a letter in the following words:
"DEAR SIR: — Referring to your letter of 31 October, to Mr. Hix, we have considered your application to be permitted to load a train of mine props on the main line, near (352) Roxobel, N.C. and are prepared to permit this, subject to the rules governing the loading of cord wood on the main line, with which you are familiar. These rules, of course, provide that you will be allowed from sunrise to sunset for loading, and that the special train must make way at all times for other trains. The rates to be charged you will be the full local rates from Roxobel to destination. Please let us know when you desire a train, and we will take up with Superintendent Hix the question of when it can be furnished."
There was evidence tending to show that before 18 November, 1901, the date of the contract, the plaintiff had already cut a large number of the mine props, and that after 22 November, 1901, when Capps notified the plaintiff that he feared he would be unable to furnish him the train if the props were to be shipped to some point in Pennsylvania or beyond the defendant's line, the plaintiff cut other props. There was further evidence that the plaintiff hauled a large number of the props to the defendant's railroad, and was ready and able to load as many as 350,000 feet. The defendant did not offer to furnish the cars or a train until about the last of February, 1902, when the plaintiff refused to use them.
The chief contention in the case of the defendant is that there was no contract between the plaintiff and the defendant to furnish cars for the transportation of the props, for that the letter from Capps to the plaintiff of 18 November, upon its face, was but a conditional contract, dependent upon the ratification or approval by Hix, the division superintendent, and that the condition is found in the last three lines of the letter, which is in these words: "Please let me know when you desire a train, and we will take up with Superintendent Hix the question when it can be furnished." It is clear to us that the letter of 18 November, in its entirety, read in connection with the plaintiff's letter (353) of 22 November to Capps, furnishes an unconditional and a complete contract to furnish the plaintiff with the cars to transport the props. The day when Hix, the division superintendent, should send the cars to the place of *Page 258 
shipment was a mere matter of detail, and, in law, to be done within a reasonable time after the plaintiff should make known his readiness for the cars.
But the defendant insists further that if the contract was a complete one, the general freight agent, Capps, had no power or authority to bind the defendant by his act. The defendant introduced two witnesses who testified that the power to make contracts for furnishing trains on the first division actually reposed in Hix. Capps had no such power. We think that that testimony, in a case like this, is in effect a conclusion of law on the part of the witnesses, and that it was not a correct conclusion. The defendant held Capps out as its general freight agent of its first division, and that designation carries with it, in law, the power to do all acts connected with the handling of freight and fixing special rates, the furnishing of trains for the movement of freight under special contract, and all matters pertaining to the subject of freights which the company itself could do. It could not be that Hix, the superintendent of transportation, could have the power to decline to furnish cars to a customer at certain times and places, in cases where the general freight agent had made especial contract with customers to furnish them. But if that were not so, the contract is a complete one, because Hix sent the plaintiff's letter in reference to the transportation of these props to Capps, and Capps, after that time, in his letter to the plaintiff, stated that he had knowledge of the plaintiff's letter to Hix, "and that we have considered your application to be (354) permitted to load the train of mine props on the main line, near Roxobel, and are prepared to permit this, subject," etc. So the correspondence discloses the joint consideration of this contract by both Capps and Hix, even if Hix's approval is necessary. His Honor was therefore right when he refused to charge the jury, at the request of the defendant, that there was no contract between the plaintiff and the defendant in respect to furnishing the cars, and also in his refusal to instruct the jury "that if they believed the evidence that Capps, the general freight agent, had no authority to make a contract."
The next in importance of the defendant's contentions is that the evidence on the fourth issue did not warrant his Honor in instructing the jury that if they believed the evidence they should answer the issue in the affirmative. The language of the fourth issue was as follows: "Did the defendant, on or about 18 November, 1901, contract and agree with the plaintiff to furnish the plaintiff with trains of cars upon which to load mine props, and to allow him to load the same at his log yard on the main line of the defendant's road, as alleged in the second cause of action *Page 259 
stated in the complaint?" The allegation on that subject in the complaint was that the defendant was to furnish the plaintiff, at such time as he might need the same, trains of cars upon which to load the mine props. The contract, as we have seen, in its entirety, was based upon the letter of the plaintiff to Capps and Hix, which is set out above. In those letters the plaintiff said he was cutting and expected to cut fifty car loads of props, and asked the defendant "to grant me train to load my props on the main line." The letter of Capps of 18 November refers to the letter from the plaintiff to him, and in that letter Capps writes of furnishing a train (italics ours). That is the ground on which the defendant rests his contention that the evidence did not fit the issue. His Honor no doubt considered that the defendant had notice that the plaintiff would require (355) accommodations in the way of train service to transport the fifty car loads of props mentioned in the contract, and he instructed the jury, upon the evidence (the contract), that they should allow the plaintiff such damages as he sustained by reason of the failure of the defendant to furnish the plaintiff trains of cars (italics ours), at his log yard on the defendant's main line, sufficient to transport fifty car loads of mine props, within a reasonable time. We think the construction his Honor put upon the contract was a correct one, and, that being so, no fault can be found with the instruction which he gave.
But the defendant further says that it nowhere appears in the evidence that the cars were to be furnished at such time as he (the plaintiff) might need the same, as was declared in the complaint. That is true, but the charge was not harmful, because his Honor said that the defendant was required to furnish the cars within a reasonable time. On the question of the reasonableness of time within which the defendant was to have furnished the cars, raised by the fifth issue, his Honor told the jury that if they believed the evidence they should say that the defendant had failed to perform its part of the contract within a reasonable time. His Honor then decided that that question was a question of law, and in that view we concur. "What is a reasonable time within which a contract must be performed is a matter of law for the court, when it depends upon the construction of a contract in writing or upon undisputed extrinsic facts." 9 Cyc., 615, and cases there cited. Seventy-five or eighty days had passed between the date of the contract and the time when the defendant tendered the cars. That, in law, was an unreasonable delay, and is not palliated by the fact that the defendant used reasonable efforts to procure foreign cars upon which the *Page 260 
props might be loaded. That was a matter which the (356) defendant should have looked to before making the contract.
The defendant further contends that the plaintiff ought not to recover damages for any loss he may have sustained by reason of the defendant's not having furnished cars to ship such props as were cut by the plaintiff before the contract was made. There is no force in that contention, for the defendant knew from the letters of the plaintiff that a large number of props had been cut before the day of the date of the contract, and that he wanted to ship them. The agreement to pay the freight for such shipment was a sufficient consideration to support the contract.
Then, again, the defendant insists that such props as were cut after the defendant had said that it might not be able to furnish the cars could not be made the subject of damages. The contract being a valid one, as we have said, the plaintiff had a right to proceed under it, and it was not in the power of the defendant to put an end to its obligation to perform its part of the contract simply because it could not carry it out. If that were the law, no person who may have been aggrieved by a breach of contract could have redress against one who had violated his part of it because he could not specifically perform what he had agreed to do.
But the defendant says that the plaintiff should have stopped his operations when he found that the defendant could not furnish cars to transport the props to Northern points. Under the contract, there was nothing said about the point of destination of the shipment of the props, and it was the defendant's duty to have furnished the cars to have transported the props to any point on its own line.
The question of the measure of damages does not arise, for it was agreed on both sides that if the plaintiff was entitled to recover anything, he was entitled to recover $2 per (357) thousand feet, or a total of $350, and the sixth issue was answered accordingly.
Upon a full examination of the case, we are satisfied that there is
No error. *Page 261